UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

EXTENET SYSTEMS, LLC,

Plaintiff,

vs.

THE VILLAGE OF OLD BROOKVILLE,

Defendant.

---------------------------------------------------------------X

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND EXPEDITED REVIEW PURSUANT TO 47 U.S.C. § 332(c)(7)(B)(v)**

Docket No. 2:25-cv-2257

Plaintiff, ExteNet Systems, LLC ("Extenet") brings this Complaint against the Village of Old Brookville (the "Village" or "Defendant"), and respectfully alleges and petitions this Court for expedited review of Defendant's violations of federal law for its: (i) unreasonable discrimination against Extenet; (ii) failure to act on Extenet's requests for permits to install small cell wireless facilities on utility poles in State and County public rights of way within the Village; and (iii) imposition of legal requirements, including unreasonable and excessive application costs and consultant fees, which have the effect of prohibiting Extenet's ability to provide telecommunications services within the Village. Federal law prohibits unreasonable permitting delays, excessive non-recurring application review fees and costs or applying local laws in an effectively prohibitory manner. The law also prohibits municipalities from unreasonably discriminating between providers of functionally equivalent wireless services.

Extenet has been trying to work with the Village for a year and a half to obtain local building permits to install five small wireless facilities on existing utility poles to provide advanced wireless and telecommunications services to the community. Each small wireless facility involves installation of a 2' diameter antenna and a 4' tall equipment cabinet attached to an existing utility pole along a public road. Despite the Village having previously granted permits to Crown Castle,

a competitor of Extenet, to install the exact same type of equipment on utility poles to provide wireless services in the Village, the Village has charged Extenet excessive application review costs and consultant fees, and held multiple site visits and public hearings, but refused to act on its permit applications. The Village has subjected Extenet to unreasonable legal requirements that not only violate federal law but are also unsupported by the Village's own Code. The Village has violated federal laws that promote the widespread availability of advanced wireless services and will continue to do so in the absence of declaratory and injunctive relief preempting its illegal application of municipal laws.

## STATUTORY AND REGULATORY FRAMEWORK

1. In 1996, Congress enacted the Telecommunications Act of 1996, No. 104-104, 110 Stat. 56 (1996), which amended the Communications Action of 1934, codified in 47 U.S.C. §151 et seq. (the "Act" or the "TCA") as a "pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans . . . ."[1]

2. Congress has declared that there is a need for wireless communication services, including "personal wireless services," as set forth in the Act, and the rules, regulations and orders of the Federal Communications Commission ("FCC") promulgated pursuant thereto.

3. In order to foster its pro-competitive, deregulatory national policy, Congress included provisions in the Act that encourage competition and restricted the regulation of the placement of personal wireless service facilities by State and local governments and instrumentalities thereof.

[1] S. Rep. 104-230, at 1 (Feb. 1, 1996) (Conf. Report).

4. Section 332(c)(7) of the Act imposes substantive and procedural limitations on State and local governments and instrumentalities thereof to ensure that the Act's pro-competitive goals are not frustrated and it expressly preempts any action or inaction by State or local governments or their agents that effectively prohibits or unreasonably discriminates in the provision of wireless services.

5. Section 332(c)(7) of the Act strikes a balance between "preserv[ing] the traditional authority of state and local governments to regulate the location, construction, and modification of wireless communications facilities like cell phone towers" and "reduc[ing] . . . the impediments imposed by local governments upon the installation of facilities for wireless communications."[2]

6. While Section 332(c)(7)(A) of the Act preserves "the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities," that authority is subject to significant limitations, including Section 332(c)(7)(B)(ii) of the Act, which requires States and local governments or instrumentalities thereof to "act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with [the relevant] government or instrumentality, taking into account the nature and scope of such request."[3]

7. The purpose of Section 332(c)(7)(B)(ii) of the Act is to counteract delays in consideration of wireless facility siting applications by State or local governments or their agents, which thwart timely rollout and deployment of wireless service.

---

[2] *T-Mobile S., LLC v. Township of Roswell*, 574 U.S. 293; 135 S. Ct. 808, 814; 190 L.Ed.2d 679 (2015); *Township of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115; 125 S. Ct. 1453, 161 L.Ed.2d 316, (2005).

[3] 47 U.S.C. § 332(c)(7)(B)(ii).

8. Section 332(c)(7)(B)(v) of the Act provides that:

> any person adversely affected by any . . . failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such . . . failure to act, commence an action in any court of competent jurisdiction.

9. As the federal agency tasked with implementing the Act, the FCC has the authority to promulgate rules and regulations to achieve the purposes of the Act.

10. Pursuant to its statutory authority, in November 2009, the FCC adopted an initial order establishing what constitutes a "reasonable period of time" under the Act for a State or local government or instrumentality thereof to take action on an application for a wireless communications site.[4]

11. In the 2009 Shot Clock Order, the FCC recognized that "personal wireless service providers have often faced lengthy and unreasonable delays in the consideration of their facility siting applications, and that the persistence of such delays is impeding the deployment of advanced and emergency services."[5] In so holding, the FCC sought to promote the deployment of broadband and other critical wireless services.[6]

12. The FCC noted that the purpose of this "shot clock deadline" was to give State or local governments or instrumentalities thereof, "a strong incentive to resolve each application within the timeframe defined as reasonable, or they will risk issuance of an injunction granting the application. In addition, specific timeframes for State and local government deliberations will

---

[4] *In the Matter of the Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance*, WT 08-165, FCC 09-99, F.C.C.R. 13,994 ¶ 71, Nov. 19, 2009. (the "2009 Shot Clock Order").

[5] 2009 Shot Clock Order at ¶32.

[6] *Id.*

allow wireless providers to better plan and allocate resources. This is especially important as providers plan to deploy their new broadband networks."[7]

13. On September 26, 2018, the FCC revised its Shot Clocks and policy.[8]

14. It is Third Report and Order the FCC "adopt[ed] two new Section 332 shot clocks for Small Wireless Facilities (commonly referred to as "small cells")—60 days for review of an application for collocation of Small Wireless Facilities using a preexisting structure and 90-days for review of an application for attachment of Small Wireless Facilities using a new structure."[9]

15. The FCC's "shot clock" timelines are codified at 47 C.F.R §1.6003.

16. The FCC also "determined that failure to meet the applicable time frame enables an applicant to pursue judicial relief within the next 30 days."[10]

17. The Shot Clock Order further codified that:

> *Timely action required.* A siting authority that fails to act on a siting application on or before the shot clock date for the application, as defined in paragraph (e) of this section, is presumed not to have acted within a reasonable period of time.[11]

18. The presumptively "reasonable period of time" runs from when an Application is first submitted or proffered.[12]

19. The FCC specifically noted that:

---

[7] *Id.* at ¶38.

[8] *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment; Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Investment*, WT 17-29, WC 17-84, FCC 18-133, Sept. 26, 2018. ("Third Report and Order"). The Third Report and Order became effective as of January 14, 2019. 83 Fed. Reg. 51,867 (2018).

[9] *Id*. at ¶ 105.

[10] *Id.* at ¶ 19.

[11] 47 C.F.R. § 1.6003(a)

[12] 47 C.F.R. § 1.6003(e).

> if an applicant proffers an application, but a state or locality refuses to accept it until a pre-application review has been completed, the shot clock begins to run when the application is proffered. In other words, the request is "duly filed" at that time, notwithstanding the locality's refusal to accept it.[13]

20. Under the FCC's Rules and Regulations, if the siting authority (i.e. the municipality) notifies an applicant seeking to deploy small cells within 10 days of the application submission that the application is materially incomplete and identifies the specific documents and information missing, the shot clock will restart at zero on the date the applicant submits the documents and information identified by the siting authority.[14]

21. The shot clock for small cells applies to "all authorizations a locality may require, and to all aspects of an steps in the siting process, including license or franchise agreements to access ROW, building permits, public notices and meetings, lease negotiations, electric permits, road closure permits, aesthetic approvals, and other authorizations needed for deployment."[15]

22. The expiration of the shot clock period without a determination by the State or local government or instrumentality on a small cell application constitutes a "failure to act" and is a presumptive prohibition of service.

23. In addition, Section 253 of the Act limits municipal authority to "management" of their owned public rights of way and preempts any state or local effort to regulate telecommunications services.

24. Section 253 also prohibits State or local authorities from erecting barriers that may prohibit or may have the effect of prohibiting the ability of any entity to provide

---

[13] Third Report and Order, at ¶145 (citations omitted)

[14] 47 C.F.R. § 1.6003(d).

[15] Third Report and Order, ¶¶ 132, 144.

telecommunications services, including taking action or inaction that results in an unreasonable delay in the deployment of the provider's facilities and provision of telecommunications services.[16]

25. The Second Circuit has held, and the FCC has confirmed, that a state or local requirement is an effective prohibition if it materially inhibits the ability of any potential competitor to enter a local market and provide services in a fair and balanced regulatory environment.

26. Sections 253(a) and 332(c)(7) also require that any actions a locality takes with respect to applications (or legislatively) be made on a competitively neutral and non-discriminatory basis.

27. In the Third Report and Order, the FCC ruled that to comply with Section 253, local aesthetic requirements for small cells must be reasonable and published in advance.[17]

28. In the Third Report and Order, the FCC also promulgated standards for rates and other fees that may be charged on small cell applications locally.

29. The Order set presumptively reasonable application fees a municipality may charge in connection with applications to collocate small cells on existing structures as $500 for a batched application of up to five small cell pole attachments, and another $100 for each small cell pole attachment above five.

30. In New York State, construction standards for small cell pole attachments on electric and telephone utility poles are subject to pole attachment agreements with utility companies administered in furtherance of regulation by the New York State Public Service

[16] 47 U.S.C. § 253(a).

[17] In *City of Portland v. United States*, 969 F.3d 1020, 1041-43 (9th Cir. 2020) *cert. denied* 141 S.Ct. 2855 (2021), the Ninth Circuit vacated certain aspects of the Third Report and Order regarding local regulation but affirmed the requirements that local aesthetic regulations must be reasonable and published in advance.

Commission ("NYS PSC") and various requirements and code standards including the National Electric Safety Code.[18]

31. In New York State, telecommunications infrastructure (which includes small wireless facilities) installed on utility poles in public rights of way is subject to the NESC, and the street work permit requirements of the respective State, County or municipal entity which owns the road in question, not state or local building codes.

32. In New York State, municipal zoning codes or other specialized home rule laws, do not apply to siting of telecommunications infrastructure on State or County owned roads.

**<u>THE PARTIES</u>**

33. Extenet is a Delaware limited liability company and maintains its principal place of business at 5844 John Hickman Parkway, Suite 600, Frisco, Texas 75034, in Collin County, Texas.

34. Extenet provides wholesale, facilities-based telecommunications services and holds certificates to provide such services in 44 states and the District of Columbia.

35. Extenet holds a Certificate of Public Convenience and Necessity ("CPCN") issued by the New York State Public Service Commission.

36. The CPCN is a statewide franchise that authorizes Extenet to do business as a wholesale telephone company in New York and grants Extenet the right to install its equipment in New York's public rights of way.

37. Extenet builds, owns, and operates wholesale, neutral-host distributed network facilities that improve the coverage and capacity of existing and new wireless networks.

[18] NY Pub. Servs. L. § 119-a; *Order Adopting Modifications to the 2004 Policy Statement on Pole Attachments and Related Proceedings,* NYS PSC Case Number 22-M-0101 (July 22, 2024)

38. Extenet's distributed network facilities (i.e. small cells) consist of: (a) fiber optic cable; and (b) small antennas and supporting equipment that are either attached to utility poles and other structures in the public rights-of-way or suspended on cables strung between utility poles or wireless support structures.

39. Wireless service providers — such as Verizon Wireless, AT&T, and T-Mobile — pay Extenet to use its distributed network facilities for the provision of wireless telecommunications services to retail consumers.

40. Defendant the Village of Old Brookville is, upon information and belief, a municipal corporation duly organized under the laws of the State of New York with a principal place of business at 201 McCouns Lane, Old Brookville, NY 11545, in the County of Nassau.

## JURISDICTION AND VENUE

41. This Court has subject matter jurisdiction over this action pursuant to: (a) 47 U.S.C. §§ 253 and 332(c)(7)(B) of the Act because Extenet has been adversely affected and aggrieved by Defendant's actions in violation of those provisions of the Act; and (b) 28 U.S.C. § 1331 because this is a civil action that presents federal questions arising under the Act.

42. This Court has jurisdiction to order declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction with regard to any state law claims pursuant to 28 U.S.C. § 1367.

43. This Court has personal jurisdiction over the Defendant, and venue is proper in this Court, as the Defendant conducts or has conducted continuous, systematic, and routine business within the County of Nassau in the State of New York and within the jurisdiction of this Court, pursuant to 28 U.S.C. § 112(c).

44. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of New York.

## EXPEDITED PROCEEDING

45. Pursuant to 47 U.S.C. § 332(c)(7)(B)(v) of the Act, this Court "shall hear and decide [this] action on an expedited basis."

## FACTS COMMON TO ALL COUNTS

46. Extenet sought to install five small cells on existing Long Island Power Authority LIPA/Public Service Electric and Gas – Long Island ("PSEG-LI") and/or Verizon Wireline ("VW") owned and maintained utility poles ("Utility Poles")

47. The Utility Poles are each in a line of numerous distribution poles in public rights of way that support electric, cable, fiber and telephone services extended to homes and businesses in Old Brookville.

48. Four of the Utility Poles are located in Nassau County public rights of way. One is located within a New York State public right of way. None are located in Village of Old Brookville public rights of way.

49. On November 10, 2023, Extenet submitted permit applications to the Village for authorization to attach their wireless telecommunications equipment to these five utility company owned Utility Poles (the "Applications").

50. Pursuant to the 47 C.F.R. §1.6003, because all small cells were proposed as collocations, the Village, and any relevant boards, agencies, or departments within the Village, were required to complete their review and decide the Applications within 60 days.

51. Additionally, pursuant to the Third Report and Order, the upward boundary of presumptively reasonable fees and costs the Village could charge Extenet in connection with the Applications was a total of $500.

52. The Applications involved projects that were in all material respects identical to projects from Crown Castle to install small cells on similar utility poles within the Village, which projects the Village approved in or about 2014.

53. Pursuant to the Village Code, applications to install wireless telecommunications facilities on poles 40 feet or less do not require any zoning special use permit but instead require only a building permit, in locations where the Village has jurisdiction.[19]

54. The Village Code also identifies priority locations for wireless telecommunications infrastructure, with the highest priority location on existing utility poles in public rights of way.

55. Extenet's Applications, to the extent subject to the Village's jurisdiction and Village Code: (1) satisfied the Village's legislated preference; (2) did not require a special permit or any other detailed review process; and (3) involved pole attachments that were in all material respects identical to applications by one of Extenet's competitors which the Village had previously approved.

56. Upon receipt of the Applications, which included a $2,000 administrative review fee, the Village failed to provide any timely notice pursuant to the shot clock rules, refused to process the Applications without their prior review by a Village consultant, and required the submission of $15,000 for consultant review fees, all as a pre-condition of reviewing and processing the Applications.

[19] Village Code § 300-45.B.

57. On January 18, 2024, the parties entered into a tolling agreement pursuant to federal law which among other things confirmed the Applications: (1) were considered "filed, received and complete as of November 10, 2023", (2) would be the subject of site visits for April 25, 2024; and (3) tolled the time for a decision by the Village until June 30, 2024.

58. Over the course of the next several months, Extenet and its professional engineers coordinated with the Village and its consultant The Center for Municipal Solutions ("CMS") to share additional details on the Applications and conduct site visits.

59. On behalf of the Village, CMS prepared a lengthy May 20, 2024 comment memorandum directly addressed to Extenet with 22 different comments that included various factual statements, opinions and legal positions ("May CMS Memo").

60. The May CMS Memo contained among other things: (1) erroneous statements of fact, (2) stated that several of the Extenet locations were "unacceptable" or "visually obtrusive", (3) asserted the Applications were "incomplete" despite the Village's agreement they were complete four months earlier, (4) tried to push the project to an expansion by Extenet's competitor of their existing locations, and (5) without any legal authority or jurisdiction to interpret the Village Code, stated that numerous submissions and additional information were "required" by the Code before the Applications would be further reviewed by the Village.

61. On June 21, 2024, Extenet provided a detailed response to each comment in the May CMS Memo, which response among other things: (1) included supplemental information including network service data, structural reports, and photographs of the existing Utility Pole locations, (2) corrected erroneous factual statements by CMS and responded to its opinions, (3) detailed how each Extenet pole attachment on the Utility Poles met the NYS PSC, PSEG-LI, and VW legal requirements, and (4) objected to any requirement that the Applications be reviewed and

processed under those Village Code sections that regulate new towers requiring a zoning special permit from the Village ("Extenet Response #1").

62. In Extenet Response #1, Senior Counsel for the company noted that the Village had limited if any legal authority to regulate telecommunications infrastructure in State and County public rights of way as a matter of New York law.

63. Despite the detailed Extenet Response #1, in reliance on the May CMS Memo, the Village refused to further process the Extenet Applications for the reasons set forth in a July 1, 2024 memorandum prepared by CMS ("July CMS Memo").

64. In July of 2024, CMS, Extenet and Village representatives and their attorneys coordinated a meeting: (1) in an effort to resolve objections to the July CMS Memo and avoid litigation, (2) at which the Village, for the first time, took the position that the Applications would require review by the Planning Board to ratify them under the Village Code, and (3) where the parties agreed to further toll the shot clock to provide the Village time to process and decide the Applications, all without prejudice to Extenet's positions and rights.

65. On July 24, 2024, counsel for Extenet provided CMS with additional responses and materials on Extenet's behalf addressing the July CMS Memo, which included among other things: (1) photosimulations of each of the proposed pole attachments on the Utility Poles, and (2) a request that any required Planning Board hearing be scheduled for August ("Extenet Response #2").

66. On August 6, 2024, CMS prepared a final "completeness" memorandum stating that "[a]fter review and discussion of the submitted supplemental material required under Section 300 of the Code of the Village of Brookville, we find that the material submitted has addressed the essential requirements for the installation of five (5) proposed DAS Nodes within the Village …at

each of the (5) subject sites, and this application is complete. We further recommend that the file be transferred to the Planning Board for review."

67. Despite ten months of efforts to address Village requirements for approval of the Applications, the Village would not schedule the Applications for review by the Planning Board during the months of August, September or October of 2024.

68. On September 13, 2024, as requested by the Village, Extenet filed with the Village Clerk all the Application materials and updated Village building permit application forms.

69. The Village finally scheduled the Applications for Planning Board review a full year after they were initially filed by Extenet and required that review also be part of a community noticed public hearing for November 14, 2024.

70. At the November 14, 2024 Planning Board hearing, Extenet's experts and engineers testified in support of the Applications and two members of the community objected to two of the proposed locations.

71. At the November 14, 2024 Planning Board hearing, CMS confirmed for the Village the Extenet's proposed small cells were needed for service in the community.

72. At the November 14, 2024 Planning Board hearing, the Planning Board requested and Extenet agreed to evaluate alternative locations for the two attachments on Utility Poles where residents had objections.

73. On November 26, 2025, Extenet and CMS conducted site visits to the two locations to evaluate alternative locations, including other nearby utility poles where a pole attachment might be feasible, or even a new utility pole on the opposite side of the road.

74. On December 10, 2024, Extenet filed additional information requested by the Planning Board at the first hearing including: (1) NYS PSC, PSEG-LI and VW state pole

attachment requirements that supersede any local requirements; and (2) existing alternative utility poles where Extenet could install a small wireless facility pursuant to state pole attachment requirements and provide wireless service.

75. On December 12, 2024, Extenet appeared at a continued Planning Board hearing, presented additional testimony and responded to Planning Board questions regarding state pole attachment requirements and the potential alternatives identified as part of the November site visit as outlined in Extenet's December supplemental submission.

76. At the December 12, 2024 Planning Board hearing, the Planning Board requested and Extenet agreed to: (1) evaluate with exacting specificity the possibility of moving the equipment cabinets up on the Utility Poles as high as possible with a Village goal of 15' above ground level for each location, and (2) provide drawings, structural reports and photodocumentary evidence regarding the two alternative small cell utility pole attachments Extenet was willing to construct as identified in its December 10, 2024 submission.

77. On January 6, 2025, Extenet filed with the Planning Board revised drawings for three original locations which identified the utility make ready work Extenet was willing to undertake to move wires on each pole in order to achieve, to the maximum extent possible under NYS PSC, PSEG-LI, VW and National Electrical Safety Code (NESC) design standards, the Village's equipment height objectives, even if it only meant a foot or two of increased equipment height above ground level.

78. On January 6, 2025, Extenet also filed with the Planning Board the drawings, structural reports, photos and other materials the Planning Board had requested for two alternative locations for two of the original locations.

79. The Village requested and Extenet submitted another $12,500 check for consultant review costs.

80. The Planning Board cancelled its January 9, 2025 hearing.

81. The Planning Board required a second notice to the community and residents in the area before it would consider acting on the Applications.

82. The Planning Board held a third public hearing on February 13, 2025 at which Extenet testified in support of the Applications and requested the Planning Board authorize the Building Inspector to approve permits for each small wireless facility in: (1) the original location, (2) the alternative location for two of the sites as submitted by Extenet, or (3) even a new utility pole across the road for one location as recommended by CMS.

83. The Planning Board refused to vote on the Applications at its February 13, 2025 meeting over the objection of Extenet.

84. At the February 13, 2025 meeting, the Planning Board requested Extenet hire an architect, study entirely new project proposals for service in Old Brookville that would involve new structures installed on the other side of the road from the existing utility poles, that these new structures be designed to look like something other than a utility pole and specifically including but not limited to an osprey nest stand.

85. At the February 13, 2025 meeting, Extenet's representatives explained they had no authority to agree to the Planning Board's request to study and completely redesign the project, highlighted the shot clock expiration date, stated a right to a decision from the Village and refused to consent to a further continuation of the Planning Board's hearing and review on the Applications.

86. On March 10, 2025, the parties entered into another tolling agreement extending the shot clock through March 24, 2025 in an effort to come to a resolution, facilitate a decision on the Applications by the Planning Board and avoid litigation.

87. In March, Extenet was further advised that another approximately $10,000 in Village costs and fees would be due and owed upon any approval of the Applications.

88. On March 24, 2025, the Shot Clock expired without action by the Planning Board.

89. The Planning Board had a meeting on April 10, 2025 where, upon information and belief the Applications were discussed, but no action on the Applications was taken.

90. Upon information and belief, the Village has or will approve recently submitted permit applications by Crown Castle to revise its existing small wireless facility equipment installed on utility poles.

91. Extenet has been irreparably harmed by the Village's imposition of discriminatory and unreasonable legal requirements and by the Village's failure to act on the Applications, which has effectively prohibited Extenet from providing wireless telecommunications services in the Village.

92. Absent expedited injunctive relief, Extenet will continue to be irreparably harmed.

**COUNT I**
**(Unreasonable Discrimination in violation of 47 U.S.C. § 332 (7)(B)(i)(I))**

93. Extenet repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated herein.

94. 47 U.S.C. § 332(c)(7)(B)(i)(I) provides that in regulating the placement or construction of wireless facilities, state or local governments "shall not unreasonably discriminate between providers of functionally equivalent services."

95. In or about 2014, the Village authorized Crown Castle to install several small cell facilities on utility poles throughout the Village.

96. The telecommunications equipment that Extenet seeks to attach to utility poles is almost identical in terms of shape, dimensions, and appearance as the Crown Castle equipment the Village approved.

97. Extenet's proposed small cell utility pole attachments pose no different aesthetic considerations than did Crown Castle's small cells as originally installed or to be modified as part of recent permit applications filed by Crown with the Village.

98. The Village has unreasonably discriminated against Extenet in violation of Section 332(c)(7)(B)(i)(I) by requiring Extenet to submit to a 16 month municipal review process, 8 times longer than presumptively reasonable, pay and charge unreasonable fees and excessive consultant review costs of approximately $40,000, prepare and submit "completeness" items not required by the Village Code, attend three public hearings, and evaluate and provide multiple supplemental submissions regarding alternative options from what the Village legislated as its highest siting preference, for locations the Village has no ownership, management or zoning authority, and after having previously approved the installation of Crown Castle's small cell equipment,

**COUNT II**
**(Unlawful Prohibition on Provision of Personal Wireless Services in Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II))**

99. Extenet repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated here.

100. Section 332(c)(7)(B)(i)(II) of the Act provides that the "regulation of the placement, construction, and modification of personal wireless service facilities by any State or

local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."

101. Defendant's unreasonable delay and failure to act on the Applications within the shot clock period constitutes a presumptive prohibition under Section 332(c)(7)(B)(i)(II).

102. Defendant's failure to act on the Applications has had the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

103. Defendant's imposition of legal requirements beyond the scope of the Village's own code has the effect of prohibiting the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

104. Defendant's imposition of excessive application costs and consulting fees has the effect of prohibiting the provision of wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II).

## COUNT III
## (For Prohibition of Services and Bar to Entry in Violation of 47 U.S.C. § 253(a))

105. Extenet repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated here.

106. 47 U.S.C. § 253(a) provides that "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

107. 47 U.S.C. § 253(a) applies to a State or local government's failure to act, which unreasonably delays deployment of a provider's personal wireless service facilities and provision of telecommunications services.

108. 47 U.S.C. § 253(a) also requires that any aesthetic requirements that a local government imposes on small cell deployments be reasonable and published in advance.

109. The Village has unreasonably delayed acting on Extenet's Applications seeking authorization to install personal wireless service facilities on existing utility poles in State and County public rights of way.

110. The Village's failure to act on the Applications constitutes an unreasonable ongoing delay which has had the effect of prohibiting the ability of Extenet to provide personal wireless facilities and telecommunications services in violation of 47 U.S.C. § 253(a).

111. The Village has also imposed unreasonable and prohibitory legal requirements on Extenet, including requiring Extenet to pay excessive application costs and consultant fees for the Village to process the Applications, requiring that Extenet satisfy unpublished and undefined aesthetic standards, refusing to act on Extenet's Applications until Extenet evaluates additional new "tower" structure options notwithstanding that Extenet's proposal does not require special permit review and meets the Village's legislated preference for telecommunications deployments, whereas the alternative options the Village demands Extenet evaluate are disfavored by the Village's own Code and located in streets the Village does not own, manage or regulate.

## COUNT IV
**(Unreasonable Delay and Failure to Act on the Applications in Violation of 47 U.S.C. § 332(c)(7)(B)(ii) and 47 C.F.R. § 1.6003(a))**

112. Extenet repeats and re-alleges each and every paragraph stated above and incorporates those paragraphs by reference, as though fully stated here.

113. 47 U.S.C. § 332(c)(7)(B)(ii) provides that, "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

114. Pursuant to 47 C.F.R §1.6003(a), "a siting authority that fails to act on a siting application on or before the shot clock date for the application . . . is presumed not to have acted within a reasonable period of time."

115. Pursuant to the FCC's Third Report and Order, a municipality's failure to act on a small cell application by the end of the Shot Clock is a presumptive prohibition of personal wireless service.

116. The Applications submitted by Extenet constitute a request for the placement of personal wireless service facilities that are small cells, and, as such, Extenet is entitled to the benefits and protections of the Act, FCC Orders, and the FCC's Rules and Regulations with respect to the Applications.

117. Pursuant to 47 C.F.R. § 1.6003 and the Parties' tolling agreements, the Village was required to act on the Applications by March 24, 2025.

118. To date, the Village has neither approved nor rejected Extenet's Applications.

119. Defendant's failure to act within the shot clock (as extended by the tolling agreements) presumptively constitutes a failure to act under Section 332(c)(7)(B)(v), enabling Extenet as applicant to pursue judicial relief.

120. Defendant's failure to act has delayed and prevented Extenet from securing the approvals and permits the Village is requiring to construct and install personal wireless service facilities on the existing Utility Poles in the State and County public right-of-way located in the Village.

121. Defendant's failure to act is neither reasonable nor supported by the Village Code, which Code requirements are preempted as applied to the Applications.

122. By its acts and omissions, Defendants have violated 47 U.S.C. § 332(c)(7)(B)(ii).

**PRAYER FOR RELIEF**

**WHEREFORE**, Extenet respectfully requests that, pursuant to 47 U.S.C. § 322(c)(7)(B)(v), the Court hear and decide this action on an expedited basis, and issue an Order and Judgment in its favor as follows:

a) finding and declaring that the Village has unreasonably discriminated against Extenet in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I);

b) finding and declaring the Village has acted to effectively prohibit the provision of telecommunications and personal wireless services in violation of 47 U.S.C. § 253(a) and 47 U.S.C. § 332(c)(7)(B)(i)(II);

c) finding and declaring that Defendant's failure to act upon Extenet's Applications within a reasonable time constitutes a violation of 47 U.S.C. § 332(c)(7)(B)(ii), which has prohibited or had the effect of prohibiting the provision of telecommunications and personal wireless services in violation of 47 U.S.C. § 253(a) and 47 U.S.C. § 332(c)(7)(B)(i)(II);

d) granting the Applications and issuing an order mandating that Defendant immediately issue all approvals, necessary permits and authorizations for Extenet to immediately install and operate the five small wireless service facilities on utility poles in State and County public rights of way as set forth in the Applications;

e) disgorging the unreasonable and excessive applications costs and consultant fees the Village required Extenet to pay and ordering that no further fees or costs be imposed on Extenet by the Village as part of the approval, construction, maintenance and operation of the five small cell facilities;

f) awarding Extenet its damages, reasonable attorneys' fees, costs, disbursements, and other expenses of this action as permitted by law; and

g) granting such other and further relief as the Court deems just and proper.

Dated: White Plains, New York
April 23, 2025

**CUDDY & FEDER LLP**
*Attorneys for Plaintiff*
445 Hamilton Avenue, 14th Floor
White Plains, New York 10601
(914) 761-1300

By: S:/*Brendan Goodhouse*
Christopher B. Fisher (CF 9494)
Brendan Goodhouse (BG1204)